**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ERIC RIVERS, VIDAL MCLAURIN, and ARRION FORD, on behalf of themselves, and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.: 23-cv-00738 Hon. Matthew F. Kennelly |
| SOUTHWAY CARRIERS, INC. | ) ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

**SECOND AMENDED CLASS ACTION COMPLAINT**

**INTRODUCTION**

Southway Carriers, Inc. is a motor carrier in the freight hauling business that engages commercial truck drivers, like Eric Rivers, Vidal Mclaurin, and Arrion Ford, to provide freight hauling services under similar "Lease-to-Purchase" Agreements and "Lease Agreements" that, in theory, provide the drivers with a path to economic independence. However, the reality is few, if any, drivers are actually able to purchase their vehicles under the "Lease-to-Purchase" contracts because (i) Southway has and exercises near complete control over the manner in which drivers perform their work, their revenues and expenses; (ii) Southway knowingly misclassifies drivers as independent contractors, in order to avoid paying a minimum wage, payroll taxes, and other employment benefits; (iii) Southway takes unauthorized deductions from drivers' wages; and (iv) Southway withholds compensation rightfully owed to drivers. Southway's mistreatment of the "Lease-to-Purchase" drivers breaches the contracts themselves, violates the federal applicable Truth-in-Leasing regulations and Fair Labor Standards Act, the Illinois Wage Payment and Collection Act, the Illinois Consumer Fraud Act, and common law.

**ALLEGATIONS**

1

1.      Plaintiffs, Eric Rivers, Vidal Mclaurin, and Arrion Ford (collectively "Plaintiffs") on behalf of themselves, and all others similarly situated, bring this action against the Defendant, Southway Carriers, Inc. ("Defendant"), as a Class Action, for: Count I, failing to comply with the Truth-in-Leasing regulation, 49 C.F.R. § 376.12; Count II, violating the Fair Labor Standards Act, 29 U.S.C. § 206(a); Count III, violating the Illinois Wage Payment and Collection Act, 820 ILCS 115/; Count IV, violating the Pass-Through of Motor Carrier Fuel Surcharge Adjustment to Cost Bearer regulation, 49 C.F.R. § 252.247-7003; Count V violating the Illinois Consumer Fraud Act 815 ILCS 505/2; Count VI for Breach of Contract; Count VII for Equitable Accounting; Count VIII for Unjust Enrichment; and Count IX for Conversion, to recover damages against the Defendant for knowingly and improperly entering lease agreements in violation of the Truth-in-Leasing regulations– 49 C.F.R. § 376.12 and withholding compensation owed to Plaintiffs.

2.      These claims are based on Defendant's use of non-compliant "Lease-to-Purchase" and "Lease Agreements" that violated several of the Truth-in-Leasing regulations, Defendant's misclassification of drivers as independent contractors to avoid paying the drivers a minimum wage, Defendant's unauthorized deductions from drivers' wages, Defendant's unlawful retention of drivers' deposits, and Defendant's unfair practice of terminating drivers' contracts prior to completion of the "Lease-to-Purchase" Agreements without cause.

**PARTIES**

3.      Plaintiff, Eric Rivers, is a citizen and resident of Durham, North Carolina. Plaintiff Rivers entered a written "Lease-to-Purchase" Agreement with Defendant on June 7, 2021, for a 2017 Volvo truck and began completing trips for Defendant.

3A.      Plaintiff, Vidal Mclaurin, is a citizen and resident of Durham, North Carolina.

Plaintiff Mclaurin entered a written "Lease Agreement" with Defendant on February 9, 2022, for a 2017 Volvo truck and began performing trips for Defendant.

3B.     Plaintiff, Arrion Ford, is a citizen and resident of Fairfax, Virginia. Plaintiff Ford entered a separate written "Lease-to-Purchase" Agreement and "Lease Agreement" with Defendant on April 26, 2021, for a 2017 Volvo truck and began completing trips for Defendant.

4.     Defendant, Southway Carriers, Inc., is an Illinois corporation and active registered motor carrier with the Department of Transportation organized under the laws of Illinois and has its chief executive offices and principal place of business at 17W735 Butterfield Rd, Unit A, Oakbrook Terrace, IL 60181.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, § 1332 and § 1367(a) because (i) Counts I, II, and IV arise under federal regulations, (ii) the state law claims in Counts III and Counts V through IX rely entirely on the same operative facts as Counts I and II over which this Court has original jurisdiction, and; (iii) Plaintiff, a citizen of North Carolina, suffered damages in excess of $75,000 because of Defendant's, a citizen of Illinois, actions as alleged in Counts I through IX.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because (i) Defendant, Southway Carriers, Inc., is a resident in this judicial district, (ii) a substantial part of the events or omissions giving rise to Plaintiffs' and the Class's claims occurred in this judicial district, and (iii) and the Defendant is subject to personal jurisdiction in this judicial district because it transacts business here and caused tortious injuries by an act or omission here.

## The Truth-in-Leasing Regulations

7.     The federal Truth-in-Leasing regulations, 49 C.F.R. § 376.1, *et seq.*, regulate the relationship between owner-operators and authorized carriers.

8.     The regulations require certain provisions are included in a written lease between an owner of equipment and an authorized carrier to protect independent operators from the unequal bargaining power and access to information possessed by carriers.

9.     49 C.F.R. § 376.1 defines:

(a) "Authorized carrier." A person or person authorized to engage in the transportation of property as a motor carrier under the provisions of 49 U.S.C. 13901 and 13902.

(b) "Equipment." A motor vehicle, straight truck, tractor, semitrailer, full trailer, any combination of these and any other type of equipment used by authorized carriers in the transportation of property for hire.

(c) "Owner." A person (1) to whom title to equipment has been issued, or (2) *who, without title, has the right to exclusive use of equipment*, or (3) who has lawful possession of equipment registered and licensed in any State in the name of that person (emphasis added).

10.     49 U.S.C. § 14102 authorizes the Secretary of Transportation ("Secretary") to require a motor carrier that uses motor vehicles not owned by it to have a written agreement with the owner.

11.     49 U.S.C. § 13301 authorizes the Secretary to prescribe regulations to carry out this part.

12.     With the Motor Carrier Safety Improvement Act of 1999, Congress transferred to the Federal Motor Carrier Safety Administration ("FMCSA") all powers related to motor carriers vested in the Secretary by chapters 133 through 149, codified at 49 U.S.C. § 113(f)(1).

13.     The FMCSA through its delegated authority from the Secretary regulates lease agreements between owners and authorized carriers under 49 C.F.R. § 376.1, *et seq.*

14.     49 C.F.R. § 376.11 provides:

… "the authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions:

4

(a) There shall be a written lease granting the use of the equipment and *meeting the requirements contained in § 376.12*" (emphasis added).

15.     Through 49 C.F.R. § 376.12 every lease between an owner and an authorized

carrier must include:

>       (d)     The amount to be paid by the authorized carrier for equipment and driver's services *shall be clearly stated on the face of the lease or in an addendum which is attached to the lease.* Such lease or addendum shall be delivered to the lessor prior to the commencement of any trip in the service of the authorized carrier. An authorized representative of the lessor may accept these documents. The amount to be paid may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease. The compensation stated on the lease or in the attached addendum may apply to equipment and driver's services either separately or as a combined amount (emphasis added).

16.     Additionally, under 49 C.F.R. § 376.12(e):

>       (e)     The lease shall clearly specify the responsibility of each party with respect to the *cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of such items*. The lease shall clearly specify who is responsible for loading and unloading the property onto and from the motor vehicle, and the compensation, if any, to be paid for this service. (emphasis added).

17.     Under 49 C.F.R. § 376.12(f) the lease must specify:

>       (f)     The lease *shall specify that payment to the lessor shall be made within 15 days after submission of the necessary delivery documents concerning a trip in the service of the authorized carrier.* The documentation required before the lessor can receive payment is limited to log books required by the Department of Transportation and those documents necessary for the authorized carrier to secure payment from the shipper. In addition, the lease may provide that, upon termination of the lease agreement, as a condition precedent to payment, the lessor shall remove all identification devices of the authorized carrier and, except in the case of identification painted directly on equipment, return them to the carrier. If the identification device has been lost or stolen, a letter certifying its removal will satisfy this requirement. Until this requirement is complied with, the carrier may withhold final payment. *The authorized carrier may require the submission of additional documents by the lessor but not as a prerequisite to payment. Payment to the lessor shall not be made contingent upon submission of a bill of lading to which no exceptions have been taken.* The authorized carrier shall not set time limits for the submission by the lessor of required delivery

documents (emphasis added).

18.     Under 49 C.F.R. § 376.12(g) the lease must allow access to information from which rates and charges are computed and imposes specific requirements on a carrier if an owner is compensated by a percentage of gross revenue:

> (g)     *When a lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, before or at the time of settlement, a copy of the rated freight bill*, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. *Regardless of the method of compensation, the lease must permit lessor to examine copies of the carrier's tariff or, in the case of contract carriers, other documents from which rates and charges are computed*, provided that where rates and charges are computed from a contract of a contract carrier, only those portions of the contract containing the same information that would appear on a rated freight bill need be disclosed. The authorized carrier may delete the names of shippers and consignees shown on the freight bill or other form of documentation (emphasis added).

19.     The leasing regulations require any items which are charged back to the owner be clearly stated in the lease under 49 C.F.R. § 376.12(h):

> (h)     The lease shall *clearly specify all items* that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, *together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge* (emphasis added).

20.     49 C.F.R. § 376.12(i) requires:

> (i)     The lease shall specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement. The lease shall specify the terms of any agreement in which the lessor is a party to an equipment purchase or rental contract which gives the authorized carrier the right to make deductions from the lessor's compensation for purchase or rental payments.

21.     49 C.F.R. § 376.12(j)

> (j)     *Insurance.*

(1) The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. 13906. The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance. *If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.* (emphasis added).

22. If escrow funds are required, then the lease must include specific information about the maintenance of the escrow account under 49 C.F.R. § 376.12(k):

(k) *If escrow funds are required, the lease shall specify*:

(1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.

(2) The specific items to which the escrow fund can be applied.

(3) That while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions involving such fund. The carrier shall perform this accounting in one of the following ways:

(i) By clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund; or

(ii) By providing a separate accounting to the lessor of any transactions involving the escrow fund. This separate accounting shall be done on a monthly basis.

(4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.

(5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid. The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91-day, 13-week Treasury bills as established in the weekly auction by the Department of Treasury.

(6)     The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease and shall provide a final accounting to the lessor of all such final deductions made to the escrow fund. The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.

23.     An authorized carrier must adhere to and perform all the provisions that are required to be included in a written lease pursuant to 49 C.F.R. § 376.12.

24.     Critically under 49 U.S.C. § 14704(a)(2):

"(a)     In General. –

(2)     A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part.

(e)     Attorney's Fees. –
The district court shall award a reasonable attorney's fee under this section. The district court shall tax and collect that fee as part of the costs of the action."

25.     Actions under 49 U.S.C. § 14704(a)(2) are subject to the "catch-all" statute of limitations period in 28 U.S.C. § 1658(a).

## FACTUAL ALLEGATIONS

26.     **Plaintiff Eric Rivers.** On or about June 7, 2021, Plaintiff, Eric Rivers, signed and entered Defendant's, Southway Carriers, Inc., "Lease-to-Purchase" Agreement for a 2017 Volvo truck ("Vehicle") attached as Exhibit 1.

27.     Upon information and belief, Exhibit 1 constitutes the entire lease agreement between Plaintiff Rivers and Defendant, including any addendums and/or attachments.

28.     Plaintiff Rivers operated the Vehicle through his wholly owned LLC, Rivers Logistics LLC.

29.     Per the terms of the agreement, Mr. Rivers paid $5,000.00 as a down payment and

thereafter made weekly payments of $400.00 for 36 months, after which title to the vehicle would be transferred to Mr. Rivers for One Dollar ($1.00).

30.     Mr. Rivers proceeded to make $400.00 weekly payments from June 2021 through September 2022 for a total of at least $30,000 over a 16-month period including down payments.

31.     From June 2021 through September 2022, Mr. Rivers also incurred approximately $25,000.00 in costs, for necessary repairs and replacement parts for the Vehicle.

32.     Upon taking possession of the Vehicle, Plaintiff Eric Rivers had the right to exclusive use of the Vehicle for the duration of the lease and Mr. Rivers began hauling freight solely for Southway.

33.     During the lease period, Southway controlled the manner of Mr. Rivers' transport business and finances, by requiring all of Plaintiff's freight operations to be run through an account that Southway controlled.

34.     More specifically, Southway acted as Mr. Rivers' dispatcher for the transport business, notifying Plaintiff of all shipping business, crediting all compensation through a single account, which Mr. Rivers used to pay all fuel and other expenditures for operation of the Vehicle.

35.     Southway used this account both to credit compensation to Mr. Rivers, and to charge Plaintiff for escrow payments, insurance payments, and weekly lease charges.

36.     Mr. Rivers was to use this account as well for credit card charges for fuel, repairs, and other expenses, for which he was the actual cost bearer.

37.     In making trip assignments, Southway acted as Mr. Rivers' trip broker, charging commission at 18% of trip compensation.

38.     In making the trip assignments, Southway often claimed or secretly withheld an

18% commission or more, on trip compensation, even where the amount of such charges should have been transparently disclosed and passed through to Mr. Rivers, as the ultimate cost bearer.

39.     Southway's failure to comply with the Truth-in-Leasing regulations and concealment of the requisite information makes it difficult for Mr. Rivers to determine the exact compensation he was owed upon the completion of a trip.

40.     On or about September 26, 2022, Mr. Rivers contacted Southway upon Plaintiff River's belief Southway was withholding all or portions of compensation, including fuel surcharges, that were actually owed to Mr. Rivers.

41.     **Fuel Surcharges.** Fuel surcharges are routinely added to rates charged to customers in times of high fuel prices.

42.     Southway charged customers fuel surcharges on routes completed by Plaintiff Rivers on August 19, 2022, and August 22, 2022, as shown in Exhibits 3 through 4.

43.     Southway received 18% of the total fuel surcharges by including the fuel surcharges in the total flat rate, which Defendant then used to calculate its 18% commission, as shown in Exhibits 5 and 6.

44.     It is industry custom and practice for the owner-operators, who actually bear the direct cost of high fuel prices, to receive the entire fuel surcharge invoiced to the customer.

45.     It is nearly impossible for owner-operators to profit without passing-through the fuel surcharge during times of high fuel prices.

46.     Upon information and belief, Southway has wrongfully charged an 18% commission on fuel surcharges for every trip Plaintiff Rivers has completed which Southway obtained a fuel surcharge from the customer.

47.     **Defendant's termination of Mr. Rivers when Mr. Rivers raised questions**

**about Defendant's charges against his account.** Shortly after receiving Mr. Rivers' inquiries about Southway's excess charges, Defendant retaliated against him, informing him there was an issue with the agreement and demanding the return of the Vehicle.

48.    Without cause, Defendant wrongfully terminated the lease, repossessed the Vehicle, and kept all of Mr. Rivers' down payment and expenditures.

49.    Defendant refused to give Mr. Rivers an accounting upon the wrongful termination of the lease and repossession of the Vehicle.

50.    Upon information and belief, Southway has withheld money which Mr. Rivers is rightfully entitled in excess of $75,000. See Exhibit 2.

50A.    **Plaintiff Vidal Mclaurin.** On or about February 9, 2022, Plaintiff, Vidal Mclaurin, with Defendant, Southway Carriers, Inc., entered a "Lease Agreement" for a 2017 Volvo truck attached as Exhibit 11.

50B.    Upon information and belief, Exhibit 11 constitutes the entire lease agreement between Plaintiff Mclaurin and Defendant, including any addendums and/or attachments.

50C.    Mr. Mclaurin operated the truck through his wholly owned LLC, Mclaurin Transport LLC.

50D.    Per the terms of the "Lease Agreement", Mr. Mclaurin paid $5,000.00 as a down payment and thereafter made weekly payments of $600.00 for 164 weeks.

50E.    Upon taking possession of the truck, Plaintiff Mclaurin had the right to exclusive use of the truck for the duration of the lease and Mr. Mclaurin began freight hauling services solely for Southway.

50F.    During the lease period, Southway controlled the manner of Mr. Mclaurin's transport business and finances in the same or similar manner as Plaintiff Rivers that is described in ¶¶ 32 through 36.

50G.    Additionally, Mr. Mclaurin was contractually obligated to report to Southway dispatch at least twice a day at 9 a.m. and 9 p.m., complete pre-trip inspections, supervise the loading and unloading of cargo – including condition checks every eight hours for refrigerated loads –, report equipment failures immediately twenty-four hours a day, and maintain a logbook for every trip as shown in Exhibit 11.

50H.    Mr. Mclaurin was subject to immediate discharge for, including but not limited to: (i) immoral conduct while on duty; (ii) failure to immediately report an accident which results in injury or property damage; (iii) failure to carry out instructions or a direct order of a supervisor; and (iv) participating in any activities that interfere with Southway operations.

50I.    Per the terms of the "Lease Agreement", Southway agreed to pay Plaintiff Mclaurin 82% of gross receipts of each load minus applicable escrow deductions, cargo and liability insurance deductions, agreed upon damage and payments, and fuel card payments.

50J.    Upon the return of Mr. Mclaurin's truck, Defendant refused to return Mr. Mclaurins's down payment, escrow payments, and final compensation.

50K.    **Plaintiff Arrion Ford.** On or about April 26, 2021, Plaintiff, Arrion Ford, entered a separate "Lease-to-Purchase" Agreement and "Lease Agreement" with Defendant for a 2017 Volvo truck attached as Exhibits 12 and 13.

50L.    Plaintiff Ford operated the truck through his LLCs, first, Ashford Logistics LLC, and then, Komee Transportation Services LLC.

50M.    Per the terms of the "Lease-to-Purchase" Agreement, Plaintiff Ford paid $5,000.00 as a down payment and thereafter made weekly payments of $400.00 for 36 months.

50N.    Plaintiff Ford had the right to exclusive use of the truck for the duration of the lease and Mr. Ford began completing routes solely for Southway upon taking possession of the truck.

50O.    During the lease period, Southway controlled the manner and finances of Mr. Ford's transport business in the same or similar manner as Plaintiff Rivers and Plaintiff Mclaurin as described in ¶¶ 32 through 36 and 50F through 50H.

50P.    Upon regaining possession of Mr. Ford's truck, Southway refused to return Mr. Ford's down payment, escrow payments, and all final compensation.

### CLASS ACTION ALLEGATIONS

51.    Plaintiffs for themselves and the class, repeat and reallege the facts and allegations contained in paragraphs 1 through 50 above, as if fully set forth herein.

52.    It is believed that Southway had similar or identical "Lease-to-Purchase" or "Lease Agreements" with an estimated fifty (50) other similarly situated drivers and similarly mistreated other drivers by taking unauthorized deductions from drivers' wages, withholding compensation earned by drivers, and misclassifying drivers as independent contractors rather than employees.

53.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and proposes to represent the following class:

> All persons and entities that entered and operated under a "Lease-to-Purchase" Agreement and/or "Lease Agreement" with Southway Carriers, Inc., during the applicable limitations periods for all Counts.

> Excluded from the Class are: (a) any judge or magistrate judge presiding over this action and members of their families; (b) Southway Carriers, Inc., and any entity in which it has a controlling interest, or which has a controlling interest in Southway and Southway's

13

legal representatives, assigns and successors; (c) and all persons who properly execute and file a timely request for exclusion from the Class.

54.    The class ("Class"), as defined above, meets the prerequisite requirements of Rule 23(a), (b)(2), and (b)(3):

55.    *Numerosity*: The Class is composed of some fifty (50) or more geographically dispersed persons, the joinder of whom in one action is impractical.

56.    *Commonality*: Questions of law and fact common to the Class exist as to all proposed members and predominate over any questions affecting only individual members of the Class. These common legal and factual issues include, but are not limited to the following:

    a.   The terms of the lease agreements between Defendant and Class members;

    b.   Whether the terms of the lease agreements complied with federal regulations;

    c.   Whether Plaintiffs and Class members are actually *employees* under the FLSA;

    d.   Whether Plaintiffs and Class members are actually *employees* under the IWPCA;

    e.   Whether Defendant's conduct as alleged is misleading, deceptive, and/or unconscionable;

    f.   Whether Defendant's withholding of compensation was unjust or inequitable;

    g.   Whether Plaintiffs and Class members are entitled to compensatory damages, including, among other things: (i) compensation for all monies withheld from class members; (ii) return of deposits withheld from class members and (iii) compensation for all monies over-charged to class members;

    h.   Whether Plaintiffs and Class members are entitled to injunctive relief.

57.    *Typicality*: Plaintiffs' claims are typical of the claims of the proposed members of

the Class, as all such claims arise out of Defendant's conduct in using a standard lease agreement with owner-operators in the trucking industry which does not conform to federal regulation, providing incomplete documentation to owner-operators, and improperly compensating owner-operators.

58.     *Adequate Representation*: Plaintiffs will fairly and adequately protect the interests of the members of the Class and have no interests antagonistic to those of the proposed Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including consumer class actions.

59.     *Predominance and Superiority*: This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members. Additionally, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impracticable. Should Class members be required to bring separate actions, this Court and courts throughout Illinois and the United States would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication of common issues, economies of scale and comprehensive supervision by this Court.

## COUNT I
### Violations of Truth-in-Leasing Regulation 49 C.F.R. § 376.12

60.     Plaintiffs for themselves and the class, repeat and reallege the facts and allegations contained in paragraphs 1 through 59 above, as if fully set forth herein.

61. At all relevant times, there were in full force and effect in Illinois the federal Truth-in-Leasing regulations. 49 C.F.R. § 376.1, *et seq.*

62. Defendant breached Truth-in-Leasing regulation 49 C.F.R. § 376.12(d); (e); (f); (g); (h); (i); (j); and (k) as detailed herein.

63. § 376.12(d) requires that the amount to be paid to the driver be stated on the lease or in an addendum but the "Lease-to-Purchase" Agreement between Plaintiff Rivers and Defendant did not contain a provision that states the amount to be paid for use of the Vehicle or Plaintiff's services.

64. Defendant did not attach an addendum to the "Lease-to-Purchase" Agreement to provide information regarding how Defendant compensated Plaintiff Rivers.

65. Upon information and belief, without clearly stating the amount Plaintiff Rivers would be compensated in the "Lease-to-Purchase" Agreement, Southway violated 49 C.F.R. § 376.12(d), by concealing the amounts that Defendant was withholding, monies rightfully owed to Plaintiff by, among other acts, not passing-through 100% of the fuel surcharges to the actual cost-bearer in accordance with industry custom and practice.

66. Southway violated § 376.12(f)'s requirement that a lease specify payment shall be made within 15 days of submission of necessary documents, because the "Lease-to-Purchase" Agreement does not specify Plaintiff Rivers shall be paid within 15 days of the necessary documentation being submitted to Defendant.

66A. § 376.12(f) also limits the documentation a driver must submit to receive payment to the logbooks required by the Department of Transportation and the documents necessary for the carrier to secure payment from the shipper.

67. Defendant delayed and withheld payments to Plaintiff Rivers if Mr. Rivers did not

submit all documentation received during a trip to Defendant as shown in Exhibits 5 and 6.

67A.    Per Schedule III Paragraph 1 of Plaintiff Mclaurin's and Plaintiff Ford's "Lease Agreements", Defendant delayed payments to Plaintiffs if Plaintiffs did not submit all paperwork from a trip as shown in Exhibits 11 and 13.

68.    Upon information and belief, Defendant violated 49 C.F.R. § 376.12(f) because Defendant required documentation as a prerequisite to payment that included documents that were not the logbooks required by the Department of Transportation or necessary to receive payment from the shipper.

69.    Additionally, § 376.12(f) requires that payment not be made contingent on submission of a bill of lading, and as shown in Exhibit 7, on requested loads Defendant required Plaintiff Rivers to submit bills of lading.

70.    Upon information and belief, Defendant required the submission of bills of lading as a condition of payment for the requested loads.

70A.    Per Schedule III Paragraph 1 of Plaintiff Mclaurin's and Plaintiff Ford's "Lease Agreements", Defendant similarly violated § 376.12(f) by requiring Plaintiffs submit the bill of lading as a condition of payment.

71.    By withholding specific information concerning the payment period or requiring excess documentation for payment, Southway violated 49 C.F.R. § 376.12(f), rendering Plaintiffs unable to ensure their entitled timely payment of compensation owed to Plaintiffs which Defendant wrongfully withheld or delayed.

71A.    49 C.F.R. § 376.12(g) requires the lease specify the carrier will give the lessor a copy of the rated freight bill when revenue is based on a percentage of gross revenue, and regardless of the compensation method, the lease must permit the drivers to examine copies of

documents from which rates and charges are computed.

72.     Defendant violated § 376.12(g) because the "Lease-to-Purchase" Agreement failed to specify that Defendant will give Plaintiff Rivers a copy of the rated freight bill, nor does the lease contain any provision specifying Defendant will give Plaintiff Rivers a copy of the information contained on a rated freight bill before or at the time of settlement.

73.     The "Lease-to-Purchase" Agreement does not give Plaintiff Rivers the right to examine the documents from which rates and charges are computed.

73A.    Plaintiff Mclaurin's and Plaintiff Ford's "Lease Agreements" also do not give Plaintiffs the right to examine the documents from which rates and charges are computed nor do the leases contain any provision specifying Defendant with give Plaintiffs copies of the information contained on a rated freight bill.

74.     Defendant violated § 376.12(g) by withholding access to copies of the rated freight bills and documents from which Southway's rates and charges are computed, leaving Plaintiffs unable to ensure Defendant appropriately calculated Plaintiffs' compensation and allowed Defendant to withhold funds rightfully owed to Plaintiffs.

74A.    49 C.F.R. § 376.12(e) requires the lease to specify each party's obligations with respect to, among other responsibilities, fuel and fuel taxes, empty milage, permits, tolls and ferries.

74B.    Similarly, 49 C.F.R. § 376.12(h) requires the lease clearly specify all items paid for by the carrier but deducted from drivers' wages with a recitation as to how the amount of each is computed and copies of documents necessary to determine the validity of the charge.

74C.    49 C.F.R. § 376.12(j) also requires a lease specify the amount which will be charged back to drivers for any insurance charge backs.

75.     Defendant violated § 376.12(e) by deducting from Plaintiffs' compensation items which were not clearly specified in the "Lease-to-Purchase" Agreements or "Lease Agreements" and similarly violated § 376.12(j) by deducting amounts for insurance not clearly specified in the lease agreements.

76.     Items not specified in the "Lease-to-Purchase" Agreement but Defendant charged-back to Plaintiff Rivers, as shown in Exhibit 6 and Exhibits 8 through 10, include but are not limited to: (i) tolls; (ii) charges labeled "Transflo"; (iii) charges labeled "WI006942"; (iv) trailer rent; (v) escrow payments; (vi) charges for "Accidental" insurance and; (vii) charges for an electronic logging device or ELD.

76A.   Items not specified in the "Lease Agreements" but Defendant charged-back to Plaintiff Mclaurin and Plaintiff Ford, as shown in Exhibits 11 through 16, include but are not limited to (i) charges labeled "Transflo"; (ii) charges labeled "WI006942"; (iii) charges for "Accidental" insurance and; (iv) charges for an ELD.

77.     The "Lease-to-Purchase" Agreement identifies a small number of charge-back items including but not limited to (i) tickets, violations, and citations; (ii) losses or damages to the Vehicle; (iii) "all taxes are license charges levied on, or assessed against, Vehicles leased under this Agreement"; (iv) repairs; (v) "oil, lubricant, tires, tubes, and all Other operating supplies and accessories that are necessary for proper and efficient operation of the Vehicles"; (vi) all fuel; (vii) towing services and; (viii) Comprehensive General Liability insurance, Business Automobile insurance, and excess liability umbrella coverage. Exhibit 1 at ¶¶ 2, 6, 7, 9, and 12.

78.     Defendant violated 49 C.F.R. § 376.12(h) because the "Lease-to-Purchase" Agreement failed to specify precisely how Defendant computed each item charged back to

Plaintiff Rivers.

78A.    Southway also violated § 376.12(h) by failing to specify precisely how Defendant computed charge-backs in Plaintiff Mclaurin's and Plaintiff Ford's "Lease Agreements" and Defendant similarly made such charge backs without the required disclosure.

79.    Defendant's obfuscation of which items can be charged-back to Plaintiffs and how charged-back items are computed violated 49 C.F.R. § 376.12(e), (h), and (j) and allowed Defendant to wrongfully charge-back items against Plaintiffs' account.

80.    The written lease agreement was also void of any terms which gives Defendant the right to make deductions for Vehicle purchase payments from Plaintiff Rivers' compensation.

81.    Beginning at the execution of Mr. Rivers' lease agreement through August 30, 2022, Defendant made sixty-four (64) deductions of $400.00 each, as shown by Exhibit 6, for a total of $25,600.00 from Plaintiff Rivers' compensation for truck payments.

82.    Contrary to 49 C.F.R. § 376.12(i), that requires a lease specify the driver is not required to purchase or rent any products from the carrier, the "Lease-to-Purchase" Agreement is void of any mention that Plaintiff Rivers was not required to purchase or rent any products, equipment, or services from Defendant as a condition of entering into the lease.

82A.    Additionally, Defendant violated § 376.12(i) because Plaintiff Mclaurin's and Plaintiff Ford's "Lease Agreements" fail to state that Plaintiffs were not required to purchase or rent any products, equipment, or services from Defendant as a condition of entering into the leases.

83.    Contrary to 49 C.F.R. § 376.12(i), Southway required Plaintiff Rivers to purchase or rent products from Defendant, as shown in Exhibits 6 through 9, including but not limited to:

(i) payments for an ELD; (ii) trailer rent; (iii) charges to use Transflo and; (iv) payments labeled "WI006942".

83A.    Southway similarly required Plaintff Mclaurin and Plaintiff Ford to purchase or rent products from Defendant, as shown in Exhibits 14 through 16, including but not limited to: (i) ELD payments; (ii) trailer rent; (iii) charges for Transflo; and (iv) payments labeled "WI006942".

83B.    If the carrier requires escrow funds, then pursuant to 49 C.F.R. 376.12(k), the lease must specify the amount of the fund, what items can be applied, the driver's right to demand an accounting, the carrier shall pay interest on the fund, and the conditions the driver must fulfill to return the fund.

84.    Defendant required Plaintiff Rivers to maintain an escrow account with Defendant from which Southway could unilaterally deduct charges against the lessee purchaser.

85.    Defendant deducted ten (10) payments of $250.00 from Plaintiff Rivers' compensation for a total of $2,500.00 labelled as "Escrow" with the final deduction occurring on August 24, 2021, as shown in Exhibit 9.

86.    All in violation of 49 C.F.R. § 376.12(k), the "Lease-to-Purchase" Agreement does not include any information regarding an escrow account, maintenance of the escrow account, what the escrow account can be used for, Plaintiff's right to demand an accounting or Plaintiff's obligations for the return of the escrow fund.

86A.    Defendant further violated § 376.12(k) by failing to return escrow payments with interest at the termination of each Plaintiffs' respective "Lease-to-Purchase" or "Lease Agreements".

87.    Upon information and belief, Plaintiff Rivers suffered damages in excess of

$75,000 as a result of Defendant's failure to adhere to and perform the Truth-in-Leasing regulation's required provisions.

## COUNT II
### Violation of Fair Labor Standards Act 29 U.S.C. § 206(a)

88.     Plaintiffs for themselves and the class, repeat and reallege the facts and allegations contained in paragraphs 1 through 87 above, as if fully set forth herein.

89.     At all relevant times, there was in full force and effect in Illinois the Fair Labor Standards Act, 49 U.S.C. § 201, *et seq.* ("FLSA"), requiring minimum wage compensation to persons who are legally employees.

90.     Under the FLSA § 206:

"(a)     Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

(1)     except as otherwise provided in this section, not less than—

(C)     $7.25 an hour, beginning 24 months after that 60th day;"

91.     29 U.S.C. § 216 provides in pertinent part:

(b)     Any employer who violates the provisions of section 206 or section 207 of this title *shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages*…An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. …*The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.* (emphasis added.)

92.     Defendant is an employer engaged in interstate commerce.

93.     Plaintiffs were Defendant's employees based upon the economic realities of the working relationship.

94. **Nature and Degree of Control.** Defendant exercised significant control over all meaningful aspects as to the manner in which Plaintiffs' performed their work  because Southway Carriers, Inc. controlled (i) advertising, billing and negotiation with customers of the terms of shipment contracts; (ii) monitored and collected data about Plaintiffs' driving; (iii) Plaintiffs were not able to hire help because it was not economically feasible; and (iv) Plaintiffs' access to the equipment could be terminated for a missed payment or failure to observe a condition of the "Lease-to-Purchase" Agreement or "Lease Agreement".

95. **Opportunity for Profit or Loss.** Defendant negotiated shipment contracts with customers and Plaintiffs relied on Defendant to provide enough favorable shipments to make a profit because Plaintiffs could not realistically render services to other motor carriers.

96. **Investment in Equipment and Employment of Other Workers.** Plaintiffs did not have any employees and could not realistically hire any workers because Plaintiffs lacked control over the shipments on offer and may not permit others to use the vehicles without Southway's prior written consent.

97. Additionally, Plaintiffs only had the means to enter the freight-hauling business because Southway Carriers, Inc. advanced a truck up front on credit and Plaintiffs had a disproportionally small stake in the trucking operation.

98. **Service Require Special Skill.** While commercial truck drivers are required to have skills beyond those of automobile drivers, the skills demanded by Defendant for employment do not set Plaintiffs apart from all of the other commercial truck drivers Defendant employs.

99. **The Degree of Permanency and Duration of the Working Relationship.** Under the "Lease-to-Purchase" Agreement, Plaintiff Rivers possessed the exclusive right to operate the

truck for a period of 100 weeks and Plaintiff Rivers was required to make weekly $400.00 payments for 36 months.

99A.    Similarly, Plaintiff Ford had the exclusive right to operate the truck for a period of 100 weeks under his "Lease-to-Purchase" Agreement. Plaintiff Ford's "Lease Agreement" automatically renewed for one year.

99B.    Like Plaintiff Ford, Plaintiff Mclaurin's "Lease Agreement" automatically renewed for one year.

100.    **Extent the Service Rendered is Integral to Employer's Business.** Defendant is in the freight hauling business and Plaintiffs hauled shipments for Defendant in the same manner as Defendant's other employee-drivers.

101.    Plaintiff Rivers routinely worked more than ten hours a day on trips for Defendant including being required to check-in daily at 9 a.m. and 9 p.m., performing pre-trip inspections, updating logbooks, and supervising the loading and unloading of cargo sometimes working in excess of 70 hours a week.

101A.   As shown in Exhibit 14, for the week ending November 25, 2022, Plaintiff Ford completed two trips for Defendant and worked at least twenty-four hours because Defendant required Plaintiff to check-in daily at 9 a.m. and 9 p.m.

101B.   Defendant paid Plaintiff Ford a total of $45.57 for the week ending November 25, 2022, which is less than $2.00 an hour.

102.    Defendant, thus, misclassified Plaintiffs as independent contractors and did not pay Plaintiffs legally required minimum wages during multiple weeks Plaintiffs were employed by Southway Carriers, Inc.

**COUNT III**
**Violations of the Illinois Wage Payment**

**and Collection Act 820 ILCS 115/ *et al*.**

103.    Plaintiffs for themselves and the class, repeat and reallege the facts and

allegations contained in paragraphs 1 through 102 above, as if fully set forth herein.

104.    At all relevant times, there was in full force and effect in Illinois the Illinois Wage

Payment and Collection Act, 820 ILCS 115/1 *et seq*. ("IWPCA").

105.    Employee is defined under 820 ILCS 115/2:

> As used in this Act, the term "employee" shall include any individual permitted to
> work by an employer in an occupation, but shall not include any individual:
>
> > (1) who has been and will continue to be free from control and direction
> > over the performance of his work, both under his contract of service with
> > his employer and in fact; *and*
> > (2) who performs work which is either outside the usual course of business
> > or is performed outside all of the places of business of the employer unless
> > the employer is in the business of contracting with third parties for the
> > placement of employees; *and*
> > (3) who is in an independently established trade, occupation, profession or
> > business. (emphasis added.)

106.    **Control and Direction Over the Performance of Work.** Defendant controlled

(i) advertising, billing and negotiation with customers of the terms of shipment contracts; (ii)

monitored and collected data about Plaintiffs' driving; (iii) required drivers to check-in twice a

day; (iv) handled all payments to Plaintiffs through an account Defendant controlled and (v)

could terminate Plaintiffs' access to the vehicle for a missed payment or failure to observe a

condition of the "Lease-to-Purchase" Agreement.

107.    Plaintiffs were Defendant's employees under the IWPCA and Plaintiffs

performed a significant amount of work for Defendant in Illinois.

108.    An employer must timely all wages earned by an employee:

> All wages earned by any employee during a semi-monthly or bi-weekly pay
> period shall be paid to such employee not later than 13 days after the end of the
> pay period in which such wages were earned. All wages earned by any employee
> during a weekly pay period shall be paid not later than 7 days after the end of the

weekly pay period in which the wages were earned.

820 ILCS 115/4.

108A.   An employer must pay all final compensation to separated employees including

any deposit paid on property that the employee returned:

> A deposit must be returned to the employee, along with any final compensation,
> provided the employee has returned the property on which the deposit was paid.

56 Ill. Adm. Code § 300.880.

109.    An employer may not make a deduction from an employee's wages unless:

> Except as hereinafter provided, deductions by employers from wages or final
> compensation are prohibited unless such deductions are:
>
>> (1) required by law;
>> (2) to the benefit of the employee;
>> (3) in response to a valid wage assignment or wage deduction order;
>> (4) made with the express written consent of the employee,…

820 ILCS 115/9.

110.    Pursuant to 56 Ill. Admin. Code § 300.720(b):

> (b) When a deduction is to continue over a period of time and the written
> agreement provides for that period of time, *provides for the same amount of
> deduction each period and allows for voluntary withdrawal for the deduction*, the
> agreement shall be considered to be given freely at the time the deduction is
> made. (emphasis added)

110A.   Deductions for cash advances must:

> If a cash advance is to be repaid through payroll deductions, both the employer
> and the employee must sign an agreement *specifying the amount of the advance,
> the repayment schedule, and the method of repayment*. (emphasis added)

56 Ill. Adm. Code § 300.750.

110B.   Any deduction for a cash advance must not exceed 15% of an employee's gross

wages for a single pay period:

> No cash advance repayment agreement shall provide for a repayment schedule of
> more than 15% of an employee's gross wages or final compensation per paycheck.

26

56 Ill. Adm. Code § 300.800.

111.    Further under 56 Ill. Admin. Code § 300.850:

An employer shall not deduct the cost of equipment required by the employer or by law from an employee's wages or final compensation unless the employee's *written consent is given freely at the time the deduction is made*. (emphasis added)

111A.   Finally, under 56 Ill. Adm. Code § 300.820:

A financial loss suffered by an employer due to damage to his/her property or to that of a customer or client shall not be deducted from an employee's pay unless the employee's expressed written consent is given freely at the time the deduction is made.

112.    If an employer violates a provision of the IWPCA, an employee may bring a civil action to recover the amount of the underpayment, damages, and reasonable attorney's fees and costs:

(a) Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, *the amount of any such underpayments and damages of 5% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees.*

820 ILCS 115/4 (a)(emphasis added)

113.    Plaintiffs routinely worked more than ten hours a day and in excess of 70 hours a week on trips for Defendant including being required to check-in daily at 9 a.m. and 9 p.m., performing pre-trip inspections, updating logbooks, and supervising the loading and unloading of cargo and Defendant violated 820 ILCS 115/4 by failing to timely pay Plaintiffs all wages earned during weeks Defendant did not pay Plaintiffs a minimum wage.

114.    Defendant also violated 820 ILCS 115/9 by making several unauthorized deductions, including but not limited to: (i) ten (10) payments of $250.00 from Plaintiff Rivers' compensation for a total of $2,500.00 labelled as "Escrow"; (ii) tolls; (iii) charges labeled

"Transflo"; (iv) charges labeled "WI006942"; (v) trailer rent; (vi) charges for "Accidental" insurance and; (vii) charges for an electronic logging device or ELD.

114A.  Defendant made similar unauthorized deductions from Plaintiff Mclaurin and Plaintiff Ford, including but not limited to: (i) Transflo charges; (ii) WI006942 charges; (iii) charges for "Accidental" insurance; and (iv) ELD charges.

115.    Defendant additionally violated 820 ILCS 115/9 and 56 Ill. Adm. Code § 300.850 because Plaintiff Rivers' "Lease-to-Purchase" Agreement did not provide for the same amount of deduction each period nor allow for Plaintiff Rivers to voluntary withdrawal from the deduction pursuant to 56 Ill. Adm. Code § 300.720(b) and Plaintiff Rivers did not give freely written consent at the time to deduct from wages (i) tickets, violations, and citations; (ii) losses or damages to the Vehicle; (iii) "all taxes are license charges levied on, or assessed against, Vehicles leased under this Agreement"; (iv) repairs; (v) "oil, lubricant, tires, tubes, and all Other operating supplies and accessories that are necessary for proper and efficient operation of the Vehicles"; (vi) all fuel; (vii) towing services and; (viii) Comprehensive General Liability insurance, Business Automobile insurance, and excess liability umbrella coverage were taken by Defendant.

115A.  Similarly, Plaintiff Mclaurin's "Lease Agreement" and Plaintiff Ford's "Lease-to-Purchase" Agreement and "Lease Agreement" did not provide for the same amount of deductions each period nor allow the Plaintiffs to voluntarily withdraw from the deductions.

115B.  Defendant violated 820 ILCS 115/9 because Plaintiffs did not give freely written consent at the time any of the Southway took any deductions listed in the "Lease-to-Purchase" or "Lease Agreements" because the agreements did not comply with 56 Ill. Admin. Code § 300.720(b).

115C.  Defendant violated 56 Ill. Adm. Code § 300.750 by taking deductions for fuel cash advances from Plaintiffs' wages when Defendant's standard "Lease-to-Purchase" Agreements and "Lease Agreements" failed to specify the amount of the advances, the repayment schedule, or the method of repayments.

115D.  Contrary to 56 Ill. Adm. Code § 300.800, Defendant's unauthorized deductions for fuel cash advances often exceeded 15% of Plaintiffs' gross wages in a single pay period.

115E.  Defendant violated 56 Ill. Adm. Code § 300.880 by not returning Plaintiffs' deposits upon taking repossession of the vehicles.

115F.  Defendant failed to comply with 56 Ill. Admin. Code § 300.720(b), thus the "Lease-to-Purchase" Agreements and "Lease Agreements" did not authorize deductions for property damage.

115G.  Defendant violated regulation 56 Ill. Adm. Code § 300.820 because Plaintiffs did not consent at the time Defendant took deductions for truck repairs and property damage.

116.  Defendant failed to timely pay Plaintiffs all earned wages, failed to make timely payment of final compensation, and took unauthorized deductions from Plaintiffs' weekly pay.

## COUNT IV
### Violation of Pass-Through of Motor Carrier Fuel Surcharge Adjustment to Cost Bearer 48 C.F.R. § 252.247-7003

117.  Plaintiffs for themselves and the class, repeat and reallege the facts and allegations contained in paragraphs 1 through 116 above, as if fully set forth herein.

118.  Under 48 C.F.R. 212.301:

(f)  The following additional provisions and clauses apply to DoD solicitations and contracts using FAR part 12 procedures for the acquisition of commercial items…

(xx)  Part 247 – Transportation.

(A)  Use the clause at 252.247-7003, Pass-Through of Motor Carrier Fuel Surcharge Adjustment to the Cost Bearer, as

29

prescribed in 247.207, to comply with section 884 of Pub. L. 110-417.

119.     48 C.F.R. 252.247-7003(b) requires a motor carrier contracting with the

Department of Defense to "pass through any motor carrier fuel-related surcharge adjustments to

the person, corporation, or entity that directly bears the cost of fuel for shipment(s) transported

under this contract."

120.     Upon information and belief that Defendant improperly withheld fuel surcharges

from Plaintiffs on commercial contracts solicited from the Department of Defense.

**COUNT V**
**Violation of the Consumer Fraud Act 815 ILCS 505/2**

121.     Plaintiffs for themselves and the class, repeat and reallege the facts and

allegations contained in paragraphs 1 through 120 above, as if fully set forth herein.

122.     At all relevant times, there was in full force and effect in Illinois the Illinois

Consumer Fraud Act, 815 ILCS 505/1, *et seq.* ("Consumer Fraud Act").

123.     Under the Illinois Consumer Fraud and Deceptive Business Practices Act, any

unfair or deceptive act or practice in the conduct of trade or commerce is actionable.  (815 ILCS

505/1, *et seq.*).  The statute expressly prohibits unfair or deceptive acts including concealment of

any material fact.

123A.   The Illinois Consumer Fraud Act defines a consumer:

The term "consumer" means any person who purchases or contracts for the
purchase of merchandise not for resale in the ordinary course of his trade or
business but for his use or that of a member of his household.

815 ILCS 505/1 (e)

124.     Section 2 of the Consumer Fraud Act, 815 ILCS 505/2 provides in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices, including
but not limited to the use or employment of any deception, fraud, false pretense,
false promise, misrepresentation or the concealment, suppression or omission of

any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been mislead, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

125.     The Act expressly incorporates violations of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, ("Uniform Act"), and the Uniform Act provides at Section 2, 815 ILCS 510/2, in pertinent part:

Section 2.       A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he: ...

(12)      engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

126.     In order to prevail in an action under the Consumer Fraud Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

127.     This Section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State.

128.     Section 10(a) of the Consumer Fraud Act, states, in pertinent part:

(a)       Any person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper.  Proof of public injury, a pattern, or an effect on consumers generally shall not be required...

(c)       Except as provided in subsection (f), (g), and (h) of this Section, in any action brought by a person under this Section, *the Court may grant injunctive relief* provided in this Section, reasonable attorney's fees and costs to the prevailing party. (Emphasis added).

129.     Plaintiff is a person under the Consumer Fraud Act, and the Defendant is a business under the Consumer Fraud Act.

129A. Defendant's "Lease-to-Purchase" Agreements are a consumer transaction involving the actual sale of trucks to the Plaintiffs for use in their respective businesses and not for resale in the ordinary course of their businesses.

**A Deceptive Act or Practice.**

130. Defendant's conduct to (i) deceptively induce drivers into "Lease-to-Purchase" Agreements that are rarely, if ever, fairly drawn or structured for their operators; (ii) conceal information required to be in the "Lease-to-Purchase" Agreements; nor (iii) turn over withheld deposits when Southway unilaterally terminates the relationships, especially when done without cause, violates the Consumer Fraud Act as a material deceptive act or practice. The Defendant's concealment keeps an owner-operator from accurately tracking their compensation and recovering their full pay.

**Intent on the Defendants' Part that the Plaintiffs Rely on the Deception**.

131. The Defendant concealed material information from the Plaintiffs and the Class.

132. The Defendant is in the best position to comply with the leasing regulations and accurately report payment information to class members and by obfuscating the pay breakdown intended to keep the withheld funds indefinitely.

**Occurred in Trade and Commerce**.

133. Defendant's wrongful conduct, as alleged herein, occurred in trade and commerce and caused actual damages to Plaintiffs and members of the Class.

**An Unfair Practice**.

133A. Terminating "Lease-to-Purchase" Agreements before completion of the agreements for no actual cause and not returning the deposits drivers paid at the conclusion of the "Lease-to-Purchase" Agreements, all are unfair treatment of the drivers.

134.    The Defendant's scheme is also unfair.

135.    The Defendant's policy is unethical and is oppressive and unscrupulous because it was done for its own profit at the expense of the Plaintiffs and class members, causing substantial injury.

## COUNT VI
## Breach of Contract

136.    Plaintiffs for themselves and the class, repeat and reallege the facts and allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

137.    The "Lease-to-Purchase" Agreement entered by Plaintiff Rivers and Defendant was a contract wherein Plaintiff Rivers agreed to pay Defendant under the terms of the agreement in exchange for exclusive use of the vehicle with the option to buy the Vehicle upon completion of the weekly payments.

138.    Under the terms of the agreement, default is defined as:

17.    The following events, without limitation, shall constitute default under the Lease:

(a) the nonpayment of Rental by Lessee for a period of five (5) days of any sum required to be paid by Lessee.

(b) The nonperformance of Lessee of any other term, condition or covenant of this Lease that is not cured with two days after notice of nonperformance from Lessor.

139.    Plaintiff Rivers was not in default when Defendant breached the agreement by wrongfully repossessing Plaintiff's Vehicle.

140.    Plaintiff Rivers has lost compensation from a lack of access to the Vehicle as well as Defendant charging Plaintiff all costs related to the wrongful repossession.

## COUNT VII
## Equitable Accounting

141.    Plaintiffs for themselves and the class, repeat and reallege the facts and

allegations contained in paragraphs 1 through 140 above, as if fully set forth herein.

142.    Defendant has exclusive access to information including any rebates, discounts, or fuel surcharges charged to its customers but withheld from the total compensation paid to Plaintiffs.

143.    Plaintiffs are unable to determine precisely the total harm caused by Defendant's breaches of contract and violations of the Truth-In-Leasing regulations without the information in Defendant's control.

## COUNT VIII
## Unjust Enrichment

144.    Plaintiffs for themselves and the class, repeat and reallege the facts and allegations contained in paragraphs 1 through 143 above, as if fully set forth herein.

145.    Defendant has unjustly retained a significant portion of the compensation owed to Plaintiffs and class members to their detriment (i) by failing to adhere to the federal Truth-in-Leasing regulations; (ii) violating the Fair Labor Standards Act; (iii) violating the Illinois Wage Payment and Collection Act; (iv) violating the Illinois Consumer Fraud Act and; (v) violating Illinois common law.

146.    Defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience because the Defendant should have followed the federal regulations and state law and provided Plaintiffs with all compensation earned during their employment.

147.    Defendant is in possession of money that unequivocally belongs to Plaintiff and class members and is retaining it inequitably.

## COUNT IX
## Conversion

148.    Plaintiffs for themselves and the class, repeat and reallege the facts and allegations contained in paragraphs 1 through 147 above, as if fully set forth herein.

149.     Conversion is an unauthorized act that deprives a person of his property permanently or for an indefinite time.

150.     Defendant has unauthorized and wrongful control, dominion, or ownership over Plaintiffs' property, by its excessive holding and retaining of compensation owed to Plaintiffs and not turning it over to Plaintiffs.

151.     The Plaintiffs and class members who hauled freight for Defendant have a right to the immediate possession of the property, absolutely and unconditionally.

152.     At all times the property claimed, belonged to the class members and that the Defendant converted it to its own use by failing to turn it over.

153.     Plaintiff Rivers' inquiry into Defendant's withholding compensation in ¶ 40 and the class action complaint constitutes a demand.

154.     The "unauthorized and wrongful assumption" of the money is alleged by the Defendant's continued retention of this money for an indefinite period of time.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against the Defendant as follows:

1.     For an order:

    a.     Certifying the case to proceed on a class basis, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b.     For the following Class:

        All persons and entities that entered and operated under a "Lease-to-Purchase" Agreement or "Lease Agreement" with Southway Carriers, Inc., during the applicable limitations periods for all Counts;

    c.     Appointing Plaintiffs as Class Representatives; and

      d.       Appointing Clinton A. Krislov and Krislov & Associates, Ltd. as Class Counsel.

2.      As to all Counts:

      a.       Award Plaintiffs and Class injunctive relief – notice and ability to claim their funds;

      b.       Award Plaintiffs and class members their actual and compensatory damages, restitution and interest;

      c.       Award reasonable attorney's fees;

      d.       Award costs; and

      e.       Grant such further relief as the Court may deem just and proper.

## JURY DEMAND

The plaintiffs by and through legal counsel hereby demand a jury in this case.

DATED: May 30, 2023

Respectfully submitted,
Plaintiffs: Eric Rivers, Vidal Mclaurin, and Arrion Ford

By their Attorneys:
/s/ Clinton A. Krislov

Clinton A. Krislov
Kenneth T. Goldstein
Matthew G. Norgard
KRISLOV & ASSOCIATES, LTD
20 Wacker Drive, Suite 1006
Chicago, IL 60606
(312) 606-0500
clint@krislovlaw.com
ken@krislovlaw.com
mnorgard@krislovlaw.com